Filed 8/19/22  P. v. Rivera CA2/4
Review denied 12/21/22; reposted with Supreme Court order and statement
**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B300948 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA143098) |
| v. | |
| MIGUEL RIVERA, | |
| Defendant and Appellant. | |

APPEAL from a Judgment of the Superior Court of California. Ricardo R. Ocampo, Judge. Affirmed in part and reversed and remanded in part.

David D. Carico, under appointment by the Court of Appeal for Defendant and Appellant.

Matthew Rodriguez, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill and Marc A. Kohm, Deputy Attorneys General for Plaintiff and Respondent.

A jury convicted Defendant and Appellant Miguel Rivera of two counts of first-degree murder and two counts of being a felon in possession of a firearm (Pen. Code[1], §§ 187, subd. (a), 29800, subd. (a)(1)), with true findings he personally discharged a firearm (§ 12022.53, subd. (d)), the murders were committed for the benefit of a street gang (§ 186.22, subd. (b)(1)(C)), and a special circumstance of multiple murder (§ 190.2, subd. (a)(3)). Rivera's theory at trial was he committed the shootings in self-defense.

Rivera argues the trial court erred in (1) admitting his statements to law enforcement and his confession to a police operative posing as a cellmate during a *Perkins* operation; (2) excluding character evidence of one of the victims under Evidence Code section 1103; (3) and instructing the jury on inapplicable theories of self-defense. He further argues (4) these errors were cumulative; (5) his convictions for felon in possession should be stayed pursuant to section 654; and (6) his parole revocation fine should be stricken.

We filed an opinion rejecting Rivera's arguments and affirming his conviction. Rivera subsequently filed a petition for rehearing, arguing for the first time that he was entitled to retroactive application of newly enacted amendments to section 186.22. (See Assembly Bill No. 333, Stats 2021, ch. 699, § 3 (AB 333).) Rivera contends, and the Attorney General concedes, that these amendments entitled him to remand and retrial on the gang enhancements. Rivera also contends that newly enacted section 1109, also added by AB 333, applies retroactively. Section

---

[1] All further undesignated statutory references are to the Penal Code.

1109 requires, upon a defendant's request, that gang enhancements and gang participation charges be tried separately and after other charges. The Attorney General disagrees, contending section 1109 applies prospectively only. We granted rehearing and vacated submission to consider these issues.

For the reasons discussed below, the gang enhancements are reversed. In all other respects, the judgment is affirmed. On remand, the prosecution shall have the option to retry the defendant on the gang allegations, and the trial court shall resentence Rivera.

## FACTUAL BACKGROUND

According to trial testimony, as summarized below, Rivera belonged to the Lynwood Mob gang. He had Lynwood Mob tattoos on his head, chest and hand.

The shootings occurred on February 28 and March 6, 2017. Rivera confessed to both shootings in a "*Perkins* operation." In a *Perkins* operation, an undercover operative, who the suspect does not know is a police agent, is placed in a cell with the suspect. (*Illinois v. Perkins* (1990) 496 U.S. 292, 294 (*Perkins*).) The agent is not required to give *Miranda* warnings before questioning or interacting with the suspect. (*Ibid.*) "Conversations between suspects and undercover agents do not implicate the concerns underlying Miranda. The essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate." (*Id.* at p. 296)

In an information filed April 11, 2018, Rivera was charged with four felonies as follows: Count One, the murder of Daniel Nunez on March 6, 2017 (§ 187, subd. (a)); Count Two, the murder of Santiago Morales on February 28, 2017 (§ 187, subd.

3

(a)); Count Three, possession of a firearm by a felon on March 6, 2017 (§ 29800, subd. (a)(1)); Count Four, possession of a firearm by a felon on February 28, 2017 (§ 29800, subd. (a)(1)). The information specially alleged that the murder charges were violent felonies committed for the benefit of a criminal street gang subjecting appellant to a 10-year enhancement for each offense. (§ 186.22, subd. (b)(1)(C).) It also alleged that Rivera, in the commission of each of the murders, personally discharged a firearm proximately causing death within the meaning of section 12022.53, subdivision (d). A special circumstance allegation of more than one offense of murder in the same proceeding was alleged with respect to both murder counts. (§ 190.2, subd. (a)(3).) The information also alleged that Rivera had suffered four prior felony convictions within the meaning of section 667.5, subdivision (b). Rivera entered a plea of not guilty and denied all special allegations.

### A. Shooting of Santiago Morales, February 27, 2017.

Victim Santiago Morales, age 52, was allegedly an 18th Street gang member. There was no evidence that Rivera knew Morales.

Late at night on February 27, 2017, Morales was in his car in a parking lot on Long Beach Boulevard near Sanborn Avenue in Lynwood. The lot was behind commercial buildings and located in Segundos gang territory. Morales had visors covering the front and rear windows of his car.

Surveillance video from a nearby business depicted the shooting. Two men approached the car, looked inside, and walked away. Both men wore hoodies, and their faces were not visible.

4

The interior lights of the car flashed, and a man, alleged to be Rivera, approached the driver's side. Both men ran away.

After receiving a call for service, a Sheriff's deputy responded to the parking lot around 8 a.m. the next day. The deputy found Morales, fully reclined, covered by a blanket up to his mid chest, and shattered glass inside the car. The car was running. No weapons were visible.

A search of Morales's vehicle yielded a simulated firearm wrapped in a sock inside a bag that was wedged between the headrest of the driver's seat and the backseat. Morales may have been conscious for a few minutes after being shot.

The bullet entered Morales's left upper arm, exited through the other side, and entered his chest. The bullet perforated his left lung, likely causing death within a few minutes. Morales had methamphetamine, amphetamine, PCP and marijuana in his system at the time of his death.

## B. Shooting of Daniel Nunez, March 6, 2017.

### 1. Nunez's Association with Rivera.

Rivera was acquainted with Nunez, who was an Evil Klan gang member. The Lynwood Mob and Evil Klan were not adversaries.

At the time of the shooting, Lizette Rivera[2] was Nunez's girlfriend. Lizette associated with members of the Lynwood Mob, and she knew Rivera as "Nutty" or "Get 'Em."

---

[2] To avoid confusion, we refer to Lizette Rivera, who is not a relative of defendant, as "Lizette."

Lizette and Nunez frequently socialized at David "Cricket" Nakiso's home, a Lynwood Mob hangout. Nakiso, a senior member of the Lynwood Mob, was the head of the gang. Lizette and Nunez had sold firearms to Nakiso in the past. Lizette sometimes committed crimes for the gang.

Nunez, who was also known as "Scooby," was a "hothead" and used his large size to intimidate people. Lizette and Nunez used methamphetamine daily, and sold drugs and engaged in check fraud.

Rivera, Nakiso, and others knew Nunez abused Lizette, as they had seen her with black eyes and a "busted" lip. Shortly before being shot, Nunez struck Lizette and sprayed her with pepper spray. On occasions when Nunez struck her, Lizette would call Nakiso to pick her up. One time, Nunez approached, chased, and menaced Lizette with a ratchet.

### 2.      *Events Leading Up to Nunez's Shooting.*

As noted above, shortly before the shooting, Nunez struck Lizette, who called Nakiso for help. Rivera arrived in a car driven by a woman to pick up Lizette. As Lizette got into the car, Rivera and Nunez exchanged words, and Nunez insulted the Lynwood Mob. Rivera pointed a handgun at Nunez, who again insulted Rivera's gang and called Rivera a "bitch." Lizette urged Rivera to stay in the car, and she drove off with him. Nunez was furious. Later, Nunez called Lizette numerous times, and called other members of the Lynwood Mob.

Nunez called Nakiso to complain that Rivera had pulled a gun on him but did not mention insulting the Lynwood Mob. The Lynwood Mob wanted to "check" Rivera. At that time, Nakiso gave Nunez the "green light" to assault Rivera the next time he

saw him. Nakiso also berated Rivera for getting involved in Nunez's domestic dispute.

After the confrontation, Lizette and Rivera hid out for a while. Lizette was angry because she felt she was being forced to choose between Nunez and Rivera. Rivera agreed to make amends with Nunez, and Rivera called Nunez. Nunez was not interested, however, and told Rivera he had a "green light" to beat him up.

Nunez was angry with Rivera because Rivera did not deliver drugs that Nunez had paid Rivera $50 to buy for him. After complaining about the failed drug deal to Nakiso, Nunez got another "green light" to assault Rivera. Rivera went into hiding.

Rivera told Lizette about the Morales shooting, telling her he had been involved in a "shootout" with someone on Long Beach Boulevard. Rivera believed it involved someone from the Segundos gang, but he was not sure. Lizette did not believe him because she had not heard about it.

### 3.     *The Day of the Nunez Shooting.*

The day of Nunez's shooting, Lizette went to Nakiso's house to wait for Rivera to arrive. Rivera was going to give Lizette a ride to the County of Los Angeles's general relief office in Compton. Rivera, Jose Romero ("Face"), another gang member known as "Stranger," and a woman Lizette believed was Face's girlfriend picked her up. Face was a Lynwood Mob member.

On the way, the group stopped at a parking lot memorial that had been set up for Morales. Rivera got out of the car and spat on the memorial. After he got back into the car, he said to Lizette, "See, I wasn't lying." A surveillance video of the stop at

7

the memorial was played for the jury. It showed Rivera walking toward the memorial, but it was unclear if Rivera was spitting.

During the drive, Lizette saw "Face" display a handgun. The handgun was passed around. After a discussion of who would hold the gun, it was given to Rivera. Lizette spent about an hour at the relief office.

On the way back from the relief office, they stopped at a gas station near the 91 Freeway. Inside, a customer and Face exchanged words with each other. Lizette attempted to break up the altercation because everyone in the store was looking, and she did not want anyone to call the police. Rivera left the store, but turned to go back in. Lizette reminded him there were cameras everywhere. They all left the store. Surveillance video from the gas station was played for the jury.

When they left the gas station, Rivera was angry because he believed Face had caused Rivera to be disrespected, and that Face should have shown the man in the store that "he wasn't a bitch."

### 4.    *The Nunez Shooting.*

After dropping "Stranger" off, they headed to Nakiso's house. Rivera continued to argue with Face and wanted to get out of the car. Lizette had been texting Nunez and told him that she was returning from the relief office. She told him who was in the car, and Nunez said he could go to Nakiso's and pick her up. She told him not to go to Nakiso's because of the previous altercation between Rivera and Nunez, and she did not want them to run into each other again. She told Nunez she would meet him halfway. Lizette let Nunez know that Rivera had a gun. Nunez,

however, wanted to confront Rivera and settle a debt with Nakiso.

Lizette wanted to pick up her bike from Nakiso's yard. Nakiso lived in a converted garage on Second Avenue in Lynwood, and the yard gate was locked. The garage fronted an alley. Nakiso, Face, and Rivera were in Nakiso's garage. Lizette asked for the key to the yard gate. Lizette went into the garage and heard Nakiso talking about Nunez's drug debt. She offered to pay it, but Nakiso refused. Lizette found his refusal "strange" because Nunez and Nakiso had a close bond. Lizette gave Nakiso a $20 bill and started to hand him a second $20 bill, but Rivera grabbed it. Rivera said he was tired of Nunez "getting a pass."

In between the time Lizette handed Nakiso the first and second $20 bills, she heard Nunez's distinctive whistle coming from the alley behind the garage.

Lizette was afraid, and asked Nakiso if he had the gun. He told her he did. Nunez whistled again and Lizette went to the gate. Lizette thought it was strange they could not find the key, because "they never lose it." Nunez told Lizette they were intentionally not letting her get her bike. Lizette was ready to jump the gate, but Nunez told her not to because it was going to be "all bad" if she did.

Face berated Nunez for owing money to Nakiso. Lizette was surprised because Face was unusually bold in speaking to Nunez. Face asked why Nunez did not pay Nakiso for the drugs. Lizette told Face she had paid Nakiso, and Nunez became angrier. Lizette went back inside to find the key.

Lizette heard someone walking on the gravel in the alleyway. She testified her "heart fell to [her] stomach." She ran outside and saw Rivera approaching. Nunez's back was to Rivera

because he was still talking to Face. Lizette warned Nunez that Rivera was approaching. Nunez shifted toward Rivera.

Lizette was holding Nunez's hand. Nunez asked Rivera "what is your problem," and Lizette tried to calm Nunez down. Lizette at this time believed the gun was still inside because Nakiso told her he had the gun. She did not want a fight to break out. Rivera was staring at Nunez. Nunez had let go of Lizette's hand. Nunez pulled up his pants as he stepped toward Rivera.

Rivera pulled a gun out and shot Nunez twice. Lizette jumped over the gate, screaming at the top of her lungs. Her phone fell. Nunez was still standing and told Lizette he was okay. She laid him on the ground. Nakiso and Face were gone, and the garage door was shut. Rivera ran away, and Lizette screamed for someone to call 911. Nunez began convulsing and told her he could not breathe. Lizette reached into Nunez's pockets to see if she could find a phone, but instead found a drill. The drill had a silver tip. Later, police on the scene of the shooting observed a portion of the drill was outside Nunez's waistband.

The fire department arrived, gave Nunez CPR, and took him away in an ambulance. Nunez sustained gunshot wounds to the upper right back and right side of the chest. One bullet entered his upper right back slightly to the midline, travelled sharply downward from right to left, perforated the right lung, diaphragm, and liver, and ended up near the spine. The second bullet perforated the right lung, diaphragm, and spleen, and exited on the left side of the chest. Nunez had methamphetamine in his system at the time of his death.

### C.     Lizette's Statements to Law Enforcement

After they arrived, deputies spoke to Lizette about the Nunez shooting. She did not tell them she knew who shot Nunez. Lizette was afraid to say anything because Nakiso and others were standing outside the garage. She did tell deputies she saw the interaction between Nunez and the shooter and saw the shooter approach through the alley. Lizette heard Nunez ask the man if he had a problem, and the man shot Nunez twice and fled.

Later, on March 7, 2017, Lizette spoke to two deputies at the Sheriff's station and told them what had happened.[3] Lizette was afraid of retaliation for talking to the authorities and was concerned for her personal safety. Nakiso tried to contact her after the shooting, but she did not talk to anyone because she was scared. Nakiso and three other men visited her at the hotel room where she had been staying after the shooting and brought her bike. Nakiso tried to persuade her to leave with him. Later, Nakiso visited Lizette at a different motel and said Nunez was a "piece of shit" and deserved to die.

Eventually, law enforcement provided funds for her to relocate, and she stayed at a motel. Lizette was still relocated at the time of trial.

In a March 9, 2017 interview with a Sheriff's deputy, Lizette recounted the events surrounding Morales's shooting. She told the deputy what Rivera had told her about his conflict with Morales and the shooting, Rivera's conduct at the memorial, and Rivera's shooting of Nunez. Rivera told Lizette there was a "shootout" with "some guy" from Segundos.

---

[3]     An audiotape of Lizette's interview was played for the jury.

11

She added that Nunez recently had provoked members of the Paragons gang by verbally insulting them and driving his vehicle at them. The Paragons responded by shooting at Nunez's truck.

### D.    Rivera's Arrest, April 25, 2017.

Rivera was arrested on April 25, 2017. Detectives informed Rivera at an interview conducted that day that he was under arrest for the Morales and Nunez shootings.[4] Both murders had been committed with a 9mm handgun, and Sheriff's Department forensics was determining whether the shootings were committed with the same weapon. After Rivera denied involvement in the shootings, detectives told him there was surveillance video of the Morales shooting and that he was in the video. Rivera then admitted being at the scene of the memorial. Rivera also told detectives that Face and Demon were the shooters. Rivera indicated he was saddened by Morales's death and visited the memorial.

On April 25, 2017, the Sheriff's detectives conducted a *Perkins* operation. Rivera did not admit his involvement in the shootings. During a second *Perkins* operation, conducted the next day, Rivera told his cellmate, an undercover informant,[5] that he

---

[4]    Initially, Rivera was a suspect in a third murder committed March 11, 2017. Detectives later ruled him out as a suspect.

[5]    The informant was paid $1,500 and received information from detectives about the murders. Portions of the taped conversation were played at trial.

was being charged with three murders, but did not know what the third one was. According to Rivera, the authorities had numerous descriptions of the suspect, but none fit him. Rivera stated the second murder was in the alley behind "big homie's" house. Rivera admitted he was on video for the first murder, but his face was covered, and he believed the detective lied when he said they could see his face. The detectives knew he was involved in the second murder, however, because it was the same gun. He called Nunez a "snitch."

### E.    Forensic Evidence.

A comparison of the bullets from both victims established they had been fired from the same weapon. Two shell casings were found in the alley where Nunez was shot. No casings were found where Morales was shot.

### F.    Gang Evidence.

Deputy Bryce Chalmers of the Sheriff's Department Operation Safe Streets Bureau testified as a gang expert. He was familiar with Lynwood gangs.

According to Chalmers, Rivera was an active member of the Lynwood Mob. Rivera has an "LMX 3" tattoo, standing for "Lynwood Mob 13," signifying allegiance to the Mexican Mafia. He has a tattoo with the letters "CK," with the "C" crossed out, standing for Crip Killer. On the index finger of his right hand is a tattoo of the word "Bang."

Chalmers testified that the Lynwood Mob gang was started in the 1980s and at the time of trial had about 40 members, with about a third of them active. The gang is aligned with the Mexican Mafia. Its territory stretched from California Avenue to

the West, Imperial Highway to the South, and Martin Luther King Boulevard to the East. Rival gangs included the Segundos and the 211 Crips. The Lynwood Mob was aligned with the Vario Paragons and the Rude Boys.

Morales was killed in Segundos territory. Jose Romero ("Face"), David Nakiso ("Cricket"), Ernie Lopez ("Smokey") are all documented members of the Lynwood Mob.

According to Chalmers, gang members generally do not get involved in domestic disputes involving other members in their own gang. An exception would be if the "Big Homie" told a gang member to go and rescue the domestic violence victim. Someone in a gang who has been called a "bitch" by another gang member will have lost all credibility, and the only way for such an individual to regain respect would be to commit a violent act. The reputation of the Lynwood Mob would have been weakened as the result of Nunez disrespecting the gang by calling one of its members a "bitch," and by the fact that Rivera drew a firearm but did not use it.

Chalmers also opined that the shooting of Morales was for the benefit of a criminal street gang. The shooting occurred in rival gang territory and thus the shooter would gain respect (among gang members). Chalmers believed Rivera was exaggerating when he told people he got into a "shoot-out."

Finally, Chalmers stated gang members commonly carried weapons. Asking a member if they "had a problem" would be viewed as a challenge.

### G.    Defense Evidence.

Rivera did not testify at trial. His defense theory at trial was that he shot both men in self-defense because he feared both

victims were reaching for firearms: Morales had a prop gun in his car, and Nunez had a drill in his pants that resembled a weapon.

Laura Cazares testified she lived near Nakiso's house and heard gunshots and Lizette's screams and went out to investigate. She called 911 at Lizette's request. Lizette told her she did not know who shot Nunez.

When Sheriff's Detective Martinez interviewed Lizette, she told him she did not know who shot Nunez. Lizette told Detective Martinez that the shooter wore a hoodie, and she believed he was from Mara Salvatrucha.

Ryan O'Connor, M.D., conducted a toxicology analysis of the victims. Both victims had methamphetamine in their systems when they died. Methamphetamine causes mood swings and aggression, as well as violent or impulsive behavior, although an individual can build up a tolerance. O'Connor opined that Nunez was highly intoxicated at the time of his death.

Dr. O'Connor reviewed the coroner's report and opined that the path of one of the bullets in Nunez's body was potentially consistent with him bending over. Dr. O'Connor opined that Morales's wounds indicated he was partially turned away from the gun.

Leslie Morales[6] testified she had been dating Face for several months, and had been to Nakiso's home.[7] She knew that Face was a gang member. Rivera went by the name "Nutty" and "Get 'Em." According to Leslie, they stopped at the memorial for the purpose of changing seats. After confronted with the

---

**6** To avoid confusion, we refer to Leslie Morales as "Leslie."

7 Face died in a traffic accident in July 2017.

15

surveillance video showing Rivera approached the memorial, Leslie stated she could not see what he did.

Regarding the stop at the gas station, Leslie recalled that a man bumped into Face, which made him angry. Face did not pull out a gun. Leslie attempted to calm him. Rivera told Face not to let people disrespect him. After the group left the gas station, she dropped them off at Nakiso's garage. She did not remember a gun nor a discussion of one.

## H.    Verdict and Sentencing.

The jury found Rivera guilty on the two murder counts (Counts 1 and 2) and the two felon in possession of a firearm counts (Counts, 3, and 4). The jury found true the firearm use allegations and that the crimes were gang related.

The trial court sentenced Rivera to life without the possibility of parole on the two murder counts, plus 25 years to life (consecutive) for the gun use enhancement, plus 10 years each (consecutive) for the gang enhancements. On Counts 3 and 4, the trial court sentenced Rivera to a determinate term of three years, eight months (consisting of an upper term of three years on Count 3 and one-third of the midterm of eight months on Count 4) to run concurrent with the sentences on Counts 1 and 2.

## DISCUSSION

## I.    ASSERTED VIOLATION OF *MIRANDA* RIGHTS.

Rivera argues his incriminating statements were obtained as a result of a two-step strategy designed to circumvent *Miranda*, and that their admission violated his Fifth Amendment right against self-incrimination. He contends deputies improperly

obtained information from him before *Mirandizing* him, and used this information to prepare the *Perkins* informant, thereby tainting his confession to the informant.

## A. Factual Background.

Before trial, Rivera moved to suppress his statements made both to the police and the civilian informant in his jail cell.

### 1. Arrest and Interrogation.

#### (a) First *Perkins* Operation.

Rivera was arrested on April 25, 2017 and placed in a jail cell with a civilian informant. The informant told Rivera that he had been charged with attempted murder. Rivera did not tell the informant anything related to the murders.

#### (b) Interview with Defendant.

Shortly after his arrest on April 25, Detectives Arias and Guzman interviewed Rivera for about 45 minutes. As the trial court noted, the interview consisted of three segments: (1) before *Miranda* warnings were given, (2) after *Miranda* warnings were given, and (3) after Rivera invoked his rights to counsel and against self-incrimination.

##### (i) Pre-*Miranda*.

Detectives interviewed Rivera without *Miranda* advisements. Rivera gave detectives information concerning his name, address, and phone number, and told detectives he lived with his girlfriend, their daughter, and her adult children. Rivera

was on probation. Although he admitted prior gang membership, Rivera denied being a current member of the Lynwood Mob.

Detectives told Rivera they were investigating the February 28 shooting of a sleeping man shot in his car near Sanborn and Long Beach Boulevard. The detectives told Rivera that he had been arrested for this shooting. Rivera admitted he had heard about the killing and that it was a "hood" thing. After being told there was video of the killing, Rivera responded that he knew there were cameras in the area. Detectives told Rivera they could identify him from the video, and asked whether Rivera had been there. Rivera denied being at the parking lot.

### *(ii)* Post-*Miranda*.

Detectives gave Rivera his *Miranda* warnings. Rivera stated he was aware of his rights in light of prior contacts with law enforcement. He wanted to clear up the matter and admitted being in the area of the February 28 shooting. He told the detectives that Face had done it, and he was with Demon at the time. Rivera claimed that Demon looked like him, and Demon was the one who shot Morales. Rivera recognized Morales from his photograph at the memorial.

The detectives told Rivera one of the three murder victims was "Scooby," who was murdered about a week after the Morales shooting in an alley off Second Avenue. Rivera denied any knowledge of the shooting. Rivera professed it would have been stupid for him to commit a crime there because he was so well known in the area.

The detectives then told Rivera that the third murder was committed March 11. Additionally, they said all three murders were committed with a 9mm weapon and the detectives were

18

awaiting ballistics results. The detectives told Rivera they had probable cause to arrest him for all three murders, and a judge had approved the arrest paperwork.

The detectives told Rivera they had video of him spitting on the memorial, and said he did not look sad.

### (iii) *Post Invocation of Miranda Rights.*

About 14 minutes after his *Miranda* warnings, Rivera invoked his right to counsel and stated, "I'm done talking, I said what I had to say." After detectives asked Rivera to clarify his statement, Rivera again said, "I'm done." After being told he had a chance to "clear" himself and detectives had given him every opportunity to do so, detectives continued talking to Rivera for another 19 minutes.

Detective Guzman stated, "I'm not even trying to imply that you're not telling me the truth. I'm just asking you a question. How do you know that Demon is the shooter instead of Face, how do you know that? It's just a question." Rivera responded that Face had told Rivera he and Demon were walking on Sanborn and they caught someone sleeping in the car. Rivera did not know what set Demon off, but Demon shot the man in the car. Rivera knew about the shooting because he overheard Demon talking to someone in Lynwood. Rivera did not know whose gun was used in the shooting.

Rivera stated he had heard about Nunez because Nunez was Lizette's boyfriend. He denied knowing anything about the shooting. Detective Arias told Rivera, "three murders is serious." Rivera asked, "[a]ll those three are me?" Detective Guzman responded, "Yes." Detective Arias added, "[w]e can't arrest you

19

without probable cause." Rivera responded: "I'm done here, thanks—I'm cool, I'm done here."

The detectives continued, telling Rivera they had eyewitnesses and videos to all three murders. Rivera responded he had people who would vouch for him. Detective Guzman asked Rivera how his girlfriend would be "able to prove" that he was with her. At that point, Rivera asked to end the interview. Detective Guzman stated, "[w]ell we will end it 'cause [sic] we just wanted to give you the opportunity to clear your name[¶]. . . .[¶] [I]f I was sitting where you were . . . . I wouldn't be asking to end it. I'd be telling you every single thing I could to help clear my name, that's what I'd be doing." Rivera said he had told them what he knew, but Detective Guzman rejected this assertion.

Again, Rivera asked to end the interview. Detective Arias responded, "you stay sitting down until we ask you to get up. Okay?" Rivera said he was just trying to pull up his pants, but Detective Guzman responded, "when you leave the room it's because we take you out of the room." Detective Arias inserted, "We gave you every opportunity to help yourself and your daughter and your family. You're getting offended and wanting to end this. You want to end it, not us, you do. So we will end it because you want to end it. Not because you want to help yourself by trying to give us the details we need."

Detective Arias accused Rivera of lying to them and changing his statements during the interview. Rivera stated "I didn't do it. I didn't." Detective Guzman said that if they thought Face did it, Face would have been "in that chair right now." The detective continued, "we know . . . there's no confusion between

you and Demon." The interview concluded when Detective Guzman stated, "I think we're done then."

### (c)    Second *Perkins* Operation.

With the information obtained from their interview, the detectives briefed the informant and instructed him to get any information he could. Later that day, detectives put Rivera in a jail cell with the informant and recorded the conversation.

Rivera told the informant the police knew about two murders, but the third one "wasn't me." The informant asked Rivera if he had been charged, and whether the same gun was used. Rivera responded that the detectives had video of the first murder, but he did not know how they knew he committed the second murder. Rivera surmised it was because the same weapon was used for both crimes. One crime occurred in an alley behind the "big homie's house." Rivera did not believe they could identify him in the video of the parking lot shooting because his face was covered. In response to the informant's query, Rivera stated he had gotten rid of the gun.

### 2.    *Rivera's Exclusion Motion.*

At the preliminary hearing, Detective Guzman stated there was no specific reason they did not give Rivera his *Miranda* warnings at the start of the interview. Although Detective Guzman knew that statements made post-invocation would not be admissible, they wanted the statements because they were going to conduct the *Perkins* operation.

Rivera argued that the pre-*Miranda* and the post-*Miranda* statements, and his statements to the *Perkins* informant, were inadmissible. Where detectives employ a two-step strategy of

eliciting admissions pre-*Miranda* to make post-*Miranda* admissions more likely, he argued, the latter statements must be excluded because the strategy is employed to undermine *Miranda* rights. The *Perkins* operation evidence, he urged, must be excluded because it was based upon statements improperly obtained in the interview. Rivera conceded his stance is contrary to *People v. Orozco* (2019) 32 Cal.App.5th 802 (*Orozco)*, but argued *Orozco* was wrongly decided and, in any event, is distinguishable because Rivera's statements to the *Perkins* operative were involuntary.

### 3. *Trial Court Ruling.*

The trial court granted the motion in part and denied it in part. The court excluded all pre-*Miranda* portions of the interview except for statements concerning Rivera's biographical information. The court ruled statements given after *Miranda* warnings were admissible as Rivera understood his rights and there was not much overlap with pre-*Miranda* questioning. The court found statements given after Rivera's invocation of his *Edwards*[8] right to counsel were inadmissible as Rivera clearly invoked his Fifth Amendment rights (by stating, "I'm done").

---

[8] *Edwards* held that a suspect who has invoked his or her *Miranda* right to counsel may not be "subject[ed] to further interrogation by the authorities" on any crime at all unless (1) counsel is present at the time of any further questioning, or (2) the suspect "himself initiates further communication, exchanges or conversations with the police." (*Edwards v. Arizona* (1981) 451 U.S. 477, 484–485.)

The trial court admitted Rivera's confession to the informant, relying in *Orozco, supra*, 32 Cal.App.5th 802*,* viewing the *Perkins* operation as separate from the interrogation.

## B.    Discussion.

### 1.    *Standard of Review.*

"In reviewing the trial court's ruling on a claimed *Miranda* violation, 'we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from [those facts] whether the challenged statements were illegally obtained.' [Citation.]" (*People v. Elizalde* (2015) 61 Cal.4th 523, 530.) Issues relating to the suppression of statements made during a custodial interrogation are evaluated under federal constitutional standards. (*People v. Flores* (2020) 9 Cal.5th 371, 416.) If an interview is recorded and the facts surrounding the admission are undisputed, we apply independent review. (*People v. Leon* (2020) 8 Cal.5th 831, 843.) We do not express any view on whether we endorse or condemn the particular interrogation techniques employed in this case; instead, our role is to determine whether those techniques comport with constitutional standards as articulated in guiding precedent.

### 2.    *Legal Principles Governing* Miranda *Inquiry.*

"'To safeguard a suspect's Fifth Amendment privilege against self-incrimination,'" a custodial interrogation must be

preceded by *Miranda*[9] warnings and by the suspect's knowing and intelligent waiver of them. (*People v. Leon, supra,* 8 Cal.5th at pp. 842–843.) A statement obtained in violation of a suspect's *Miranda* rights may not be admitted to establish guilt in the prosecution's case-in-chief. (*People v. Elizalde, supra,* 61 Cal.4th at pp. 531–532; *People v. Krebs* (2019) 8 Cal.5th 265, 299 (*Krebs*).)

"[T]he mere fact that a defendant has made unwarned admissions does not render subsequent warned confessions inadmissible [Citations.]". (*Krebs, supra,* 8 Cal.5th at p. 307, citing *Oregon v. Elstad* (1985) 470 U.S. 298, 314 (*Elstad*).) In *Elstad,* an 18-year-old burglary suspect spontaneously spoke to police in his parents' living room pre-*Miranda* warnings. (*Elstad.* at pp. 300–301.) *Elstad* held that "[a] subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." (*Id.* at p. 314.) *Elstad* acknowledged, however, that if the prewarning statement is the product of actual coercion, "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second

---

9       Statements made by a defendant subject to custodial interrogation are inadmissible unless the defendant was "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." (*Miranda v. Arizona* (1966) 384 U.S. 436, 444–445.)

24

confession. [Citations.]" (*Id.* at p. 310.) Thus, when considering whether an initial failure to warn taints any subsequent warned statement, the touchstone inquiry is whether both prewarning and postwarning statements were voluntary under the traditional due process test. (*Id.* pp. 317–318.)

The two-step interrogation process used here was denounced in *Missouri v. Seibert* (2004) 542 U.S. 600 (*Seibert*), which revisited *Elstad*. *Seibert* concluded the *Elstad* rule was inapplicable when an officer intentionally uses a two-step interrogation process in order to circumvent *Miranda*. (*Seibert, supra*, 542 U.S. at p. 604 (plur. opn. of Souter, J.).) In *Seibert,* the officers intentionally did not *Mirandize* the suspect before questioning her for 30 to 40 minutes. (*Id.* at pp. 604–605) The suspect admitted having information regarding a murder, and the officers took a 20-minute break. (*Id.* at p. 605.) After resuming the interview, the defendant was given her warnings. (*Ibid.*) The officer testified he had been taught, as an interrogation technique, to "question first, then give the warnings, and then repeat the question 'until I get the answer that [the suspect] already provided once.' [Citation.]" (*Seibert*, at pp. 605–606.)

*Seibert* "confronted a situation where the interrogating officer 'made a "conscious decision" to withhold *Miranda* warnings.' [Citation.]" (*Krebs, supra*, 8 Cal.5th at p. 308.) *Seibert* distinguished *Elstad'*s "good faith *Miranda* mistake" from the questioning in the case before it, which had been "systematic, exhaustive, and managed with psychological skill." (*Seibert, supra*, 542 U.S. at pp. 615–616 (plur. opn. of Souter, J.).) The *Seibert* plurality created a new test to determine whether the *Miranda* warnings administered after questioning commenced

were effective enough to protect a defendant's rights against involuntary self-incrimination. The new test called for consideration of "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." (*Id.* at 615.)

In *Seibert,* Justice Kennedy issued a separate opinion, concurring in the judgment but rejecting the plurality's conclusion a "multifactor" test should apply whenever a two-stage interrogation occurs. (*Seibert, supra*, 542 U.S. at p. 622 (conc. opn. of Kennedy, J.).) Justice Kennedy fashioned an inquiry focused on whether the officers deliberately employed a two-step interrogation designed to undermine the effectiveness of *Miranda* warnings. (*Ibid.*) If the two-phase interrogation was deliberate, then any post-warning statement related to the substance of prewarning statements must be suppressed "absent specific, curative steps." (*Id.* at p. 621.) On the other hand, if the two-step interrogation was not deliberate, then Justice Kennedy believed *Elstad* should continue to govern the admissibility of a post-warning statement by evaluating whether the prewarning and postwarning statements were voluntary. (*Id.* at p. 622.)

The fragmented composition of *Seibert* has "given rise to a debate over whether it is the plurality's opinion or Justice Kennedy's concurrence that provides the controlling standard. [Citations.]" (*Krebs, supra,* 8 Cal.5th at p. 309.) *Krebs* observed that while the Sixth Circuit Court of Appeals has adopted the plurality's multi-factor test, other circuits (including the Second, Third, Fifth, Eighth, Ninth, and Eleventh) have all adopted

26

Justice Kennedy's approach. (*Ibid*.) The California Supreme Court has not yet determined which approach controls, concluding in *Krebs* it was unnecessary to address the question because the defendant's argument failed under either. (*Ibid*.)

### 3. *The Trial Court Properly Admitted the Statements Obtained at the Interrogation and Through the* Perkins *Operation.*

#### *(a)* No Violation of *Seibert.*

Rivera argues that law enforcement's deliberate strategy to violate his *Miranda* rights required suppression of all incriminating statements made not only during his custodial interrogation but during the *Perkins* operation as well. In particular, Rivera complains that the trial court failed to analyze his statements under *Seibert* and whether the officers deliberately used a question-first, warn-later approach. He requests this court to independently analyze whether there was a deliberate two-step strategy and whether the midstream warnings functioned to allow him to make an informed waiver. He points to the facts that the first round was lengthy, detailed, coercive, and continuous with the second round; the two rounds overlapped in content; they were conducted in the same custodial setting; and the interrogators treated the two rounds as continuous.

We disagree. There was no systematic questioning before the *Miranda* warnings, nor was there any evidence the detectives were attempting to avoid *Miranda* through a deceptive two-step process.

Here, the first *Seibert* factor, an inquiry into the completeness and detail of the first round, shows little transpired

27

other than the officers' statements about the Morales shooting, the contents of the video, and their purported identification of Rivera. Rivera denied involvement in the Morales shooting and denied being at the parking lot, but admitted he knew about the cameras, had heard about the shooting, and believed it was a "hood" thing. The Nunez shooting was not mentioned.

On the second factor, after being given *Miranda* warnings, Rivera offered greater detail, blaming the Morales shooting on Demon. At that point, the detectives confronted Rivera with the Nunez shooting, told him he was a suspect in three murders, and told him they had probable cause to arrest him for all three murders. Rivera continued to deny involvement. Post-invocation, Rivera continued to deny involvement, and although the detectives continued questioning, Rivera repeatedly stated he was "done."

On the third and fourth factors, the pre- and post-*Miranda* portions of the interview were conducted at one time, with the same detectives, although on the fifth factor, the detectives did not treat the second round as continuous with the first because of the increased level of detail post-*Miranda*.

Our evaluation of these factors indicates that the detectives did not engage in a deliberate "question first, warn later" approach designed to elicit a confession such that the subsequent *Miranda* warning was ineffective. Indeed, after being given the warning, Rivera gave the detectives greater detail. There never was a confession. This is thus not the situation where the un-*Mirandized* portion of the interview left "little, if anything, of incriminating potential . . . unsaid." (*Seibert, supra,* 542 U.S. at p. 616; see also *Bobby v. Dixon* (2011) 565 U.S. 23, 29–31 [key issue

whether defendant confessed to crime before *Miranda* warnings].)

### *(b)* *Statements Made During the* Perkins *Operations Were Not Tainted.*

Rivera seeks to invoke the "fruit of the poisonous tree" doctrine developed in such cases as *Wong Sun, et al. v. United States* (1963) 371 U.S. 471, 488, and apply it to the *Perkins* operation on the basis the *Perkins* operation benefitted from the alleged *Miranda* violation. He asserts the interrogation and the *Perkins* operation were not separate but part of one continuous enterprise, and the court erred in permitting the jury to hear the interview in order to make sense of the *Perkins* operation. Further, he argues the trial court's reliance on *Orozco, supra,* 32 Cal.App.5th 802, was misplaced because the custodial interrogation and *Perkins* operation were not separate events, and in any event, not only is *Orozco* distinguishable, it was wrongly decided.

We disagree. In *Perkins,* the Supreme Court held statements made to a police informant did not implicate Fifth Amendment rights against self-incrimination because there was no police-dominated atmosphere and no compulsion to answer. (*Perkins, supra,* 496 U.S. at pp. 296–297.) Thus, admission of Rivera's unwarned statements to the informant did not violate *Miranda.*

In addition, no court has addressed invocation of *Miranda* rights prior to a *Perkins* operation and the effect of any statements obtained in violation of *Miranda* in such a situation. We decline Rivera's invitation to do so. Relying on language in *Perkins* and the underlying policy of *Miranda* and *Edwards*, the California Courts of Appeal have long rejected the argument

29

Rivera makes here, holding that *Miranda* and *Edwards* are not implicated when a defendant who has invoked the *Miranda* right to counsel subsequently speaks to a person he or she does not know is an agent of the police. (*Orozco, supra,* 32 Cal.App.5th at p. 814; accord, *People v. Plyler* (1993) 18 Cal.App.4th 535, 544–545; *People v. Guilmette* (1991) 1 Cal.App.4th 1534, 1539–1542.)

In analyzing the issue, *Orozco* concluded *Perkins,* not *Edwards,* controlled the admissibility of any statements made to an undercover agent after *Miranda* warnings. (*Orozco, supra,* 32 Cal.App.5th at p. 813.) First, *Edwards* applied its rule only to further "interrogation" of the suspect. (*Ibid.*) Indeed, *Edwards* observed that "'[a]bsent . . . *interrogation*, there would be no infringement of the [*Miranda*] right [to counsel].' [Citation.]" (*Ibid.*) Second, the rationales of *Miranda* and *Edwards,* the pressure of custodial interrogation, do not apply where the suspect speaks freely to someone they do not consider to be law enforcement. (*Id.* at p. 814.) Third, California courts have uniformly held *Perkins* controls when a suspect invokes his *Miranda* right to counsel but later speaks with someone he does not know is an agent of the police. (*Id.* at p. 815) We agree with *Orozco* that *Perkins* controls the admissibility of Rivera's statements to the informant, and find the trial court did not err.

### (c)   Rivera Has Not Demonstrated His Statements to the Informant Were Involuntary

Rivera further argues his statements to the informant were involuntary and deprived him of due process under the Fourteenth Amendment. Further, he asserts he was misled by the detectives that an information had already been filed,

requiring us to address whether the lawfulness of the *Perkins* operation should be addressed as though his right to counsel had already attached.

### (i)    Factual Background.

After his arrest on April 25, Rivera was interviewed, at which time the detective falsely told him that a magistrate had made a probable cause determination. The felony complaint was not filed until two days later, after the completion of the two *Perkins* operations.  Shortly after the detective made his misrepresentation, Rivera asserted his right to counsel.

### (ii)   Discussion

The right to counsel attaches at the time of filing a felony complaint. Once this right attaches and has been asserted, law enforcement may not use an informant to obtain information from a defendant. (See, e.g., *Massiah v. United States* (1964) 377 U.S. 201, 205–206 [interrogation of defendant without presence of counsel after indictment prohibited]; *People v. Viray* (2005) 134 Cal.App.4th 1186, 1198-1199 [same].)

The constitutional right to due process secured by the federal and California Constitutions mandates the suppression of an involuntary confession. (*People v. Linton* (2013) 56 Cal.4th 1146, 1176.) A confession is involuntary if official coercion caused the defendant's will to be overborn, such that the resulting statement is not the product of free will. (*Ibid.*) We judge whether a confession was involuntary by examining the totality of circumstances surrounding the confession. (*Ibid.*)

As discussed above, we have declined to extend *Miranda/Edwards* protections to a *Perkins* operation. Furthermore, nothing here indicates Rivera's statements to the

31

informant were anything other than voluntary. Although Rivera falsely believed an information had been filed against him, "[t]he use of deceptive statements during an investigation does not invalidate a confession as involuntary unless the deception is of the type likely to procure an untrue statement. [Citations.]" (*People v. Fayed* (2020) 9 Cal.5th 147, 165.) Here, informing Rivera he had already been charged would not have caused him to feel compelled to tell the informant he had committed the crimes. Moreover, there was no evidence his cellmate intimidated him such that Rivera felt the need to brag to appear tough.

### 4.      *Any Error Was Not Prejudicial.*

The erroneous admission of statements obtained in violation of the Fifth Amendment is reviewed for prejudice under the standard of *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). (*People v. Henderson* (2020) 9 Cal.5th 1013, 1029.) That test requires the prosecution "'to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citation]" (*Ibid.*)

Here, compelling evidence that Rivera committed both crimes was before the jury even without considering the challenged portion of the interview and his statements to the *Perkins* operative. Lizette testified extensively to Rivera's involvement in both crimes and what he told her about them, and Lizette witnessed the second shooting. Indeed, Rivera's theory of self-defense in part relied on the jury crediting Lizette's testimony concerning Rivera's fear of other gang members. Assuming the jury believed Rivera was in the video of the Morales shooting, the video established Rivera and his accomplice approached the car and after assessing the situation, Rivera quickly fired the gun at the victim.

32

## II. EXCLUSION OF EVIDENCE REGARDING VICTIM MORALES UNDER EVIDENCE CODE SECTION 1103

Rivera argues the trial court prejudicially erred by excluding evidence of Morales's prior violent behavior under Evidence Code section 1103. He contends the court erroneously required an equivalency or conformity between the past conduct and the current event, and in applying Evidence Code section 352, the court erroneously found the remoteness of the events and potential juror confusion weighed against its admission.

### A. Factual Background.

At trial, pursuant to Evidence Code section 1103, Rivera sought to introduce evidence of the victims' propensity for violence to support his claim of self-defense. Morales's prior bad acts included: (1) a September 9, 1992, conviction for robbery where Morales hit and threw down the victim; (2) an October 16, 1994, robbery conviction where he grabbed a woman, pushed her to the ground, kicked her in the stomach, stole items from her and threatened someone who tried to help; (3) a February 9, 1999, incident where officers stopped Morales for several traffic violations while riding a bike and Morales physically resisted; (4) a May 2, 2009, arrest for criminal threats in violation of section 422, where he was holding a rifle, threatened to shoot somebody, and looked through their property; (5) a December 2, 2009, felony conviction for threatening an executive officer in violation of sections 69 and 71, and one count of destroying evidence in violation of section 135, for which he received a five-year prison sentence.

The court excluded the evidence, finding the prior acts were not in conformity with reaching for a simulated gun and further

the acts were remote in time. The court stated that the evidence was being offered to show the victim was violent, but that the evidence did not conform to Morales's conduct while in his car. It stated: "The conduct we were talking about is the reaching for a simulated gun." The court found the little probative value in the evidence was substantially outweighed by the consumption of time in presenting the evidence.

## B.    Discussion.

Evidence Code 1103 makes admissible, subject to Evidence Code section 352, evidence of the character or trait of character of the victim of the crime for which the defendant is being prosecuted if the evidence is offered by the defendant to prove conduct of the victim in conformity with the character or trait of character. (Evid. Code, § 1103, subd. (a)(1).)[10]

A defendant being prosecuted for homicide who asserts self-defense may introduce evidence of specific violent acts by the victim on a third person to show that the victim had a violent character and was the aggressor in the current offense. (*People v. Wright* (1985) 39 Cal.3d 576, 587 (*Wright*); *People v. Shoemaker* (1982) 135 Cal.App.3d 442, 446–447.)

---

[10]    Section 1103, subdivision (a)(1) states: "In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if the evidence is: [¶] (1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character."

The admission of evidence pursuant to Evidence Code section 1103, however, is not without limits and is subject to the dictates of Evidence Code section 352. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 827–828 (*Gutierrez*); *Wright, supra*, 39 Cal.3d at p. 587.) The court may exclude otherwise admissible evidence if admitting the evidence would confuse the issues at trial, unduly consume time, or be more prejudicial than probative. (*Gutierrez, supra*, 45 Cal.4th at pp. 827–828.)

We review the trial court's rulings under Evidence Code section 352 using the deferential abuse of discretion standard. (*Gutierrez, supra*, 45 Cal.4th at p. 827; *People v. Pollock* (2004) 32 Cal.4th 1153, 1171.) "Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. [Citation.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113.)

Here, there was no abuse of discretion. The incidents were all more than five years before the shooting, and two of them were more than 20 years old. On that basis, the incidents were minimally relevant to show the 52-year-old Morales's current propensity for violence. With respect to similarity, the only incident where Morales used a weapon involved brandishing a rifle in connection with making criminal threats, making four of the incidents of marginal relevance. Balanced against the consumption of time and potential for jury confusion required for introduction of this evidence, the trial court's decision to exclude it was within the confines of its discretion under Evidence Code section 352.

## III. INSTRUCTION WITH CALCRIM NOS. 3471 and 3472.

Rivera argues the trial court erred in instructing with CALCRIM Nos. 3471 (Self-Defense, Mutual Combat or Initial Aggressor) and 3472 (Right to Self-Defense: May not be Contrived) because these instructions had no basis in the facts of the case. He contends these instructions, when given with two other self-defense instructions, confused the jury and eviscerated his perfect self-defense claim because they instructed on legal principles which incorrectly enabled jurors to deny the right to self-defense if he started a fight by approaching Morales's car and failed to avoid Nunez. As a result, he contends, these "initial aggressor" (No. 3471) and "provocateur" (No. 3472) instructions deprived Rivera of a fair trial, and the error was prejudicial, requiring reversal.

### A. Factual Background.

Rivera conceded committing the shootings but claimed he did so in self-defense. Rivera argued he feared both victims were reaching for what he believed to be firearms: Morales a prop gun, and Nunez a drill. The prosecution rebutted by asserting shooting a victim in the side (Morales) and another in the back (Nunez) did not support a claim of self-defense. Further, the prosecution asserted the video did not support the conclusion that Morales was a threat, and Lizette testified Rivera initiated the confrontation with Nunez.

The trial court gave a packet of self-defense instructions, including Justifiable Homicide: Self-Defense or Defense of Another (CALCRIM No. 505), Voluntary Manslaughter, Imperfect Self-Defense or Imperfect Defense of Another (CALCRIM No. 571); the two challenged instructions, Right To

36

Self-Defense: Mutual Combat or Initial Aggressor (CALCRIM 3471) and Right To Self-Defense: May Not Be Contrived (CALCRIM No. 3472); and Danger No Longer Exists or Attacker Disabled (CALCRIM No. 3474). The court also instructed the jury to consider the instructions together and cautioned that some instructions might not apply (CALCRIM 200).

Rivera objected that Nos. 3471 and 3472 were unsupported by the evidence because neither the acts of walking towards Morales's car nor approaching Nunez in the alley could be considered aggression, nor did he provoke a fight. Although the trial court agreed there was no combat, it stated that the instruction on initial aggressor addressed the assertion that Rivera walked up and confronted Nunez. The court found the same logic supported the instruction prohibiting a provocateur from claiming self-defense.

### B.    Discussion.

We review assertions of instructional error de novo. (*People v. Waidla* (2000) 22 Cal.4th 690, 733.) Further, we evaluate the correctness of jury instructions by reviewing the entire charge of the trial court and not by considering only parts of an instruction or a single instruction. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.) Finally, we also presume jurors understand and follow the court's instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

Even if an instruction correctly states a principle of law, if it has no application to the facts of the case, it is an error to offer it. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129 (*Guiton*).) Thus, "instructions *not* supported by substantial evidence should not be given. [Citation.]" (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1050 (*Ross*).) "[G]iving an irrelevant or inapplicable instruction,

however, is generally "'only a technical error which does not constitute ground for reversal.'" [Citation.]" (*People v. Cross* (2008) 45 Cal.4th 58, 67; *People v. Eulian* (2016) 247 Cal.App.4th 1324, 1335.) "[I]nstruction on an unsupported theory is prejudicial only if that theory became the sole basis of the verdict of guilt[.]" (*Guiton, supra,* at p. 1130.) Prejudice resulting from this type of error is measured by the *Watson* test. (*Id.* at p. 1130; *Ross*, at pp. 1054-1055; see *People v. Watson* (1956) 46 Cal.2d 818.)

### 1. Instructing with CALCRIM No. 3471 was Harmless Error

CALCRIM No. 3471 is a self-defense mutual combat instruction that explains that a person who engages in mutual combat or starts a fight only has a claim to self-defense if he actually and in good faith tried to stop fighting, indicated that he wanted to stop fighting, that he had stopped fighting, and gave the opponent a chance to stop fighting.

Here, Rivera argues no legal or factual basis existed for giving this instruction, and that the court misinterpreted No. 3471 as applying to anyone (not only an assailant) causing the confrontation resulting in a homicide, while the instruction by its terms is limited to the person who initiated the assault. Rivera points out that he did not start a fight with either Morales or Nunez. In the latter case, there was no evidence he was displaying a firearm.

We agree the factual basis for this instruction was absent because there is no indication Rivera attempted to stop any altercation with either of the victims after engaging with them. Instead, he shot them. We conclude, however, that even if the instruction was erroneously given, Rivera did not suffer resulting

prejudice. The jury was instructed on multiple theories of self-defense, including lawful self-defense and imperfect self-defense, and instructed that not all instructions would apply to the case. There is no indication the jury applied No. 3471 to the facts before it. Rather, the jury rejected all theories of self-defense and found Rivera guilty of premeditated murder. Thus, it cannot be said that absent the instruction, the jury would have accepted the applicable theories of self-defense and rejected the inapplicable ones. (*People v. Watson, supra,* 46 Cal.2d at pp. 836–837.)

## 2. Instructing with CALCRIM No. 3472 was Proper, but if not, It Was Harmless Error

CALCRIM No. 3472 explains that a defendant cannot claim self-defense if his wrongful conduct creates circumstances that justify the adversary's attack. (*People v. Enraca* (2012) 53 Cal.4th 735, 761 [discussing perfect and imperfect self-defense].)

Rivera argues this instruction was error because the evidence does not support the conclusion he provoked either Morales or Nunez. He argues that with respect to Morales, there is no evidence of any provocation, and with respect to Nunez, he was not required to avoid him simply because Nunez had the "green light" to assault him; indeed if Rivera had retreated from Nunez it would have emboldened Nunez and exacerbated the threat.

Here, there was evidence to conclude that Rivera initiated both encounters. Rivera and another unidentified person approached Morales, who had a prop gun in the car, and they may have exchanged words. Rivera approached Nunez in the alley behind the gang headquarters at Nakiso's in order to provoke an altercation because Nunez had the "green light."

Even if the instruction should not have been given because it was irrelevant, Rivera did not suffer resulting prejudice. We presume the jury followed the instructions, and if there was no instigation of a fight—contrived or otherwise with either victim—to justify offering CALCRIM No. 3472, the jury would have disregarded it as inapplicable under these facts.

### 3. *No Federal Constitutional Error.*

Rivera contends the claimed misdirection of the jury here with the inapplicable instructions violated his due process rights to a fair trial under the Fourteenth Amendment. He argues the infringement of his right to assert self-defense was of constitutional dimensions because it made the prosecution's burden easier to disprove his claim.

"[F]undamental fairness [is] the touchstone of due process[.]" (*Gagnon v. Scarpelli* (1973) 411 U.S. 778, 790.) A due process violation is usually established when the state proceeds in a manner that renders a trial fundamentally unfair. A "jury instruction" may "'so infuse[ ] the trial with unfairness as to deny due process of law.' [Citations.]" (*Estelle v. McGuire* (1991) 502 U.S. 62, 75.) The question is whether the ailing "'instruction by itself so infected the entire trial that the resulting conviction violates due process.' [Citations.]" (*Id.* at p. 72; *People v. Foster* (2010) 50 Cal.4th 1301, 1335.) However, "'[i]t is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole *and the trial record.*' [Citation.]" (*People v. Foster*, *supra*, at p. 1335.) We will conclude ""[a] trial is fundamentally unfair if 'there is a reasonable probability that the verdict might have been different had the trial been properly conducted.'"

[Citations.]" (*Barrientes v. Johnson* (5th Cir. 2000) 221 F.3d 741, 753.)

Here, Rivera has not demonstrated constitutional error because the instructions as a whole, the evidence at trial, and the jury's verdict, establish that the result would not have been different if the instructions had not been given. The jury rejected any theory of self-defense, even the properly instructed ones.

## IV. ASSERTED CUMULATIVE ERROR.

Defendant argues the impact of the individual evidentiary and instructional errors in this case requires reversal, and given the federal constitutional errors asserted in this case, all errors must be reviewed under the *Chapman* standard. Rivera points to the claimed erroneous admission of his statements to police and his confession to the informant which he contends left him with no alternative but to assert self-defense and imperfect self-defense. These errors, he contends, precluded him from testifying in his defense.

We disagree. We have found no error in the court's rulings with respect to Rivera's statements and confession, nor have we found error with respect to its evidentiary ruling and jury instructions. Thus, there can be no cumulative error. (*People v. Duong* (2020) 10 Cal.5th 36, 75.)

## V. ASSERTED SENTENCING ERRORS.

### A. Section 654.

Rivera argues that the trial court erred in failing to stay his sentence on his convictions for felon in possession of a firearm (§ 29800, subd. (a)(1)) because the prosecution's theory of the case was that the illegal possession occurred simultaneously with the

murders. Thus, he argues, possession of the firearm and the subsequent use in the murders was one indivisible act with a single objective, namely, the shooting of the victims. The trial court's findings of fact in this regard are error, he contends, and the error violated his due process rights.

### 1. Factual Background.

The information charged Rivera in Counts 3 and 4 with being a felon in possession of a handgun. (§ 29800, subd. (a)(1).) The language for both counts tracked the statute. It charged "the crime of POSSESSION OF FIREARM BY A FELON- PRIOR(S), in violation of PENAL CODE SECTION 29800(a)(l), a Felony, was committed by MIGUEL NICHOLAS RIVERA, who did unlawfully own, possess, purchase, receive, and have custody and control of a firearm, to wit, handgun, the said defendant having theretofore been duly and legally convicted of a felony or felonies . . . ." The counts alleged the offenses occurred on the same date as each of the murders.

During opening statement, the prosecution argued that the firearm was used to kill the two victims. The jury was instructed with CALCRIM 2511 that "[t]he defendant is charged in Counts 3 and 4 with unlawfully possessing a firearm. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶]1. The defendant possessed a firearm; [¶] 2. The defendant knew that he possessed the firearm; [¶] AND [¶] 3. The defendant had previously been convicted of a felony." The prosecution argued to the jury that defendant was guilty of a section 29800, subdivision (a)(1) violation because he was a felon and "he shot and killed and murdered these two individuals [when] he had a gun with him."

42

The jury verdict found "true" the finding that Rivera personally discharged a firearm in the commission of the crimes, and that he possessed a firearm as a felon on Counts 3 and 4.

During sentencing, Rivera requested the court to strike, stay, or run concurrently the sentences on Counts 3 and 4. The trial court refused, finding that "[t]he sentence is not subject to 654, since as to each crime, the defendant was armed before the acts involved in Counts 1 and 2."

## 2. *Discussion.*

Section 654, subdivision (a) provides that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." "The purpose of section 654 is to prevent multiple punishment for a single act or omission, even though that act or omission violates more than one statute and thus constitutes more than one crime. Although the distinct crimes may be charged in separate counts and may result in multiple verdicts of guilt, the trial court may impose sentence for only one offense. . . . [Citation.]" (*People v. Liu* (1996) 46 Cal.App.4th 1119, 1134, fn. omitted.)

In *People v. Corpening* (2016) 2 Cal.5th 307, the Supreme Court explained the analytical framework for applying section 654. The Supreme Court found a distinction between conduct that constituted a single act and conduct that had a single objective. (*Id*. at p. 311.) "Whether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry, because the statutory reference to 'an act or omission' may include not only a discrete physical act but also a course of

conduct encompassing several acts pursued with a single objective. [Citations.]" (*Ibid.*) First, the court must consider whether the different crimes were committed by a single physical act. (*Ibid.*) "If so, the defendant may not be punished more than once for [the single] act." (*Ibid.*) "Whether a defendant will be found to have committed a single physical act for purposes of section 654 depends on whether some action the defendant is charged with having taken separately completes the actus reus for each of the relevant criminal offenses. [Citations.]" (*Id.* at p. 313.)

"Only if we concluded the case involves more than a single act—i.e., a course of conduct—do we then consider whether that course of conduct reflects a single 'intent and objective' or multiple intents and objectives. [Citations.]" (*People v. Corpening, supra*, 2 Cal.5th at pp. 311–312.) However, "even if a course of conduct is 'directed to one objective,' it may 'give rise to multiple violations and punishment' [only] if it is 'divisible in time.' [Citations.]" (*People v. Deegan* (2016) 247 Cal.App.4th 532, 542.) "Where the defendant's acts are 'temporally separated' they 'afford the defendant opportunity to reflect and to renew his or her intent before committing the next [offense], thereby aggravating the violation of public security or policy already undertaken.' [Citation.]" (*Ibid.*)

A defendant's intent and objective are factual questions. (*People v. Islas* (2012) 210 Cal.App.4th 116, 129.) For there to be sufficient evidence to support multiple punishment, there must be evidence to support a finding the defendant formed a separate intent and objective for each offense for which he was sentenced. (*Ibid.*)

44

The elements of a section 29800, subdivision (a)(1) offense require "conviction of a felony and ownership or knowing possession, custody, or control of a firearm. [Citations.]" (*People v. Blakely* (2014) 225 Cal.App.4th 1042, 1052.) The offense is completed once the intent to possess is perfected by possession. (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1146.) Where a defendant arrives at a crime scene already armed and uses the weapon to commit another crime, the firearm possession is a separate and antecedent offense. (*People v. Arce* (2020) 47 Cal.App.5th 700, 714; see also *People v. Venegas* (2020) 44 Cal.App.5th 32, 38; Cf. *People v. Bradford* (1976) 17 Cal.3d 8, 22 [where defendant used gun wrested from police officer to shoot officer; section 654 applied].)

Here, the trial court's conclusions and factual findings are supported by substantial evidence. The evidence established that Rivera possessed the gun in advance of both shootings, making the two offenses severable in time. He approached Morales's car with the gun already in his possession. The day of Nunez's shooting, Rivera and the others in the car passed the gun around. Later, back at Nakiso's, Lizette believed the gun was in the house, but Rivera approached Nunez from behind with the gun in his hand. These facts support the conclusion that because he possessed the gun before each shooting, Rivera had a separate intent and objective for both offenses.

## B.    Parole Revocation Fine.

At sentencing, the court imposed and stayed a $1,000 parole revocation fine pursuant to section 1202.45.[11] Rivera argues that because he was given life without parole (and hence no parole attached) as sentences on Counts 1 and 2, and the determinate terms in Counts 3 and 4 should have been stayed pursuant to section 654, there was no authorized sentence imposed which included a period of parole; thus, the suspended parole revocation fine is unauthorized and must be stricken. (*People v. Carr* (2010) 190 Cal.App.4th 475, 483, fn. 6; see generally *People v. McWhorter* (2009) 47 Cal.4th 318, 379-380.)

We disagree. Where, as here, the trial court properly imposed concurrent determinate terms on counts 3 and 4, his sentence includes a period of parole, and imposition of a parole revocation fine was appropriate. (See, e.g., *People v. Brasure* (2008) 42 Cal.4th 1037, 1075.) Parole "was included in his determinate sentence by law and carried with it, also by law, a suspended parole revocation restitution fine." (*Ibid.*) We observe that Rivera is not prejudiced by assessment of the fine, which will become payable only if he actually does begin serving a period of parole and his parole is revoked.

## VI.    REMAND FOR RETRIAL OF GANG ALLEGATIONS.

After we filed the opinion in this matter, Rivera filed a petition for rehearing asserting he was entitled to the

---

[11]    Section 1202.45, subdivision (a) requires a sentencing court to assess a parole revocation fine "[i]n every case where a person is convicted of a crime and his or her sentence includes a period of parole[.]"

46

ameliorative benefits of AB 333, effective January 1, 2022, implementing changes to the proof of criminal street gang enhancements and street terrorism, and adding a provision at section 1109 to provide for bifurcation and a post-guilt phase trial of those allegations. As noted above, we granted rehearing and vacated submission to consider these issues.

We conclude, as urged by Rivera and conceded by the Attorney General, that the new evidentiary standards for proving gang enhancements in section 186.22 apply retroactively and require retrial on the gang allegations. We do not consider, however, whether the bifurcation provisions of section 1109 apply retroactively because we find no prejudice resulting from the lack of bifurcation at Rivera's trial. We also conclude retrial of the gang allegations does not violate the double jeopardy or due process clauses, and remand for retrial.

### A.     Amendments to Section 186.22.

AB 333 found "[g]ang enhancement evidence can be unreliable and prejudicial to a jury" because such evidence "is lumped into evidence of the underlying charges[,] further perpetuat[ing] . . . convictions of innocent people." (Stats. 2921, ch. 699, § 2(d)(6)); see *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1129.) Further, "the mere specter of gang enhancements pressures defendants to accept unfavorable plea deals rather than risk a trial filled with prejudicial evidence and a substantially longer sentence." (*People v. Ramos, supra,* 77 Cal.App.5th at p. 1129.) As a result, AB 333 modified the evidentiary standard for admission of gang evidence, and provided for bifurcation of trials to separate the gang evidence from the underlying charges. The statute is silent as to

47

retroactivity. (*People v. Rodriguez* (2022) 75 Cal.App.5th 816, 822.)

### 1.      *Substantive Changes.*

Previously, section 186.22 provided that a defendant who commits a felony "for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members" is subject to increased punishment upon conviction. (Former § 186.22, subd. (b)(1).)

In 2021, the Legislature enacted AB 333, which amended section 186.22 to impose new substantive and procedural requirements for gang allegations. Most notably, the law defined "to benefit, promote, further, or assist" as "to provide a common benefit to members of a gang where the common benefit is more than reputational. Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).)

In addition, under prior law, there was no requirement that the predicate offense be gang related. (*People v. Rodriguez, supra,* 75 Cal.App.5th at p. 822.) The new law imposes a stricter requirement for proof of a predicate offense, namely "a pattern of criminal gang activity," which is necessary to prove that the group with which the defendant is associated is indeed a criminal street gang. (See § 186.22, subd. (f).) Previously, the prosecution needed to prove only that those associated with the gang had committed at least two offenses from a list of predicate crimes on separate occasions within three years of one another. (See former § 186.22, subd. (e).)

Under the newly amended law, the current offense cannot be used as one of the two predicate offenses. (§ 186.22, subd. (e)(2).) In addition, both predicate offenses must have been committed "within three years of the date the current offense is alleged to have been committed," by gang "members," and must have been for the "common[ ] benefit[ ] [of] a criminal street gang." (§ 186.22, subd. (e)(1).)

Thus, in summary, pursuant to the new legislation, imposition of a gang enhancement requires proof of the following additional requirements with respect to predicate offenses: (1) the offenses must have "commonly benefited a criminal street gang" where the "common benefit[ ] . . . is more than reputational"; (2) the last predicate offense must have occurred within three years of the date of the currently charged offense; (3) the predicate offenses must be committed on separate occasions or by two or more gang members; and (4) the charged offense cannot be used as a predicate offense. (Assem. Bill No. 333 (Reg. Sess.) § 3, § 186.22, subd. (e)(1)–(2).)

## 2.     *Procedural Changes.*

New section 1109 provides that, upon the defendant's request, the trial court must bifurcate an enhancement charged under section 186.22, subdivision (b) from the underlying charges. (§ 1109, subd. (a).) In addition, such separate proceedings must be held after the determination of the defendant's guilt in the underlying offenses. (§ 1109, subd. (a).)[12]

---

[12]     Section 1109 provides: "(a) If requested by the defense, a case in which a gang enhancement is charged under subdivision

49

## B. Retroactivity.

Rivera contends that he is entitled to retroactive application of both the substantive and procedural changes affecting gang enhancements. The Attorney General, as noted above, concedes Rivera is entitled to the benefit of the substantive but not the procedural changes.

### 1. *Substantive Changes.*

Ordinarily, "a new statute is presumed to operate prospectively absent an express declaration of retrospectivity or a clear indication that the electorate, or the Legislature, intended otherwise." (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 287, fn. omitted (*Tapia*).) In *In re Estrada* (1965) 63 Cal.2d 740

---

(b) or (d) of Section 186.22 shall be tried in separate phases as follows: [¶] (1) The question of the defendant's guilt of the underlying offense shall be first determined. [¶] (2) If the defendant is found guilty of the underlying offense and there is an allegation of an enhancement under subdivision (b) or (d) of Section 186.22, there shall be further proceedings to the trier of fact on the question of the truth of the enhancement. Allegations that the underlying offense was committed for the benefit of, at the direction of, or in association with, a criminal street gang and that the underlying offense was committed with the specific intent to promote, further, or assist in criminal conduct by gang members shall be proved by direct or circumstantial evidence. [¶] (b) If a defendant is charged with a violation of subdivision (a) of Section 186.22, this count shall be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime. This charge may be tried in the same proceeding with an allegation of an enhancement under subdivision (b) or (d) of Section 186.22."

(*Estrada*), however, our Supreme Court recognized an exception to this rule. The court explained that "[w]hen the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. . . . The amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final." (*Id.* at p. 745.)

Further, the Supreme Court has expanded the application of the retroactivity doctrine broadly "to statutes changing the law to the benefit of defendants." (*Tapia, supra*, 53 Cal.3d at p. 301.) Thus, the retroactivity principle applies to ameliorative changes in enhancements as well as to substantive offenses. (*People v. Nasalga* (1996) 12 Cal.4th 784, 792–793.)

As AB 333 increases the threshold for conviction of a section 186.22 offense and imposition of the enhancement, we therefore agree that Rivera is entitled to the benefit of the substantive changes in the law. (*People v. Lopez* (2021) 73 Cal.App.5th 327, 344.) To prove that a defendant committed a felony "for the benefit of, at the direction of, or in association with a criminal street gang," (§ 186.22, subd. (b)(1)) the new law requires the prosecution to show that "the common benefit [to the gang] is more than reputational." (§ 186.22, subd. (g)) The law thus redefines the enhancement for the benefit of the defendant and should be applied retroactively to Rivera.

### 2. *Procedural Changes.*

There is a split of authority whether section 1109's procedural changes apply retroactively. In *People v. Burgos* (2022) 77 Cal.App.5th 550 (review granted July 13, 2022,

S274743) (*Burgos*), the court found section 1109 applied retroactively. (*Id.* at pp. 564–568; see also *People v. Ramos, supra,* 77 Cal.App.5th at p. 1119 [section 1109 retroactive].)

In *People v. Perez* (2022) 78 Cal.App.5th 192 (review granted Aug. 17, 2022, S275090), however, the court held that section 1109 did "not apply retroactively to a trial that ha[d] already occurred." (*Id.* at p. 207; see also *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65 (review granted Aug. 17, 2022, S275341) [section 1109 prophylactic and designed to employ new features aimed at enhancing fairness of future proceedings and does not make any change to any crime or defense or punishment].)

No part of the Penal Code "is retroactive, unless expressly so declared." (§ 3.) Section 3 imposes a strong presumption of prospective operation, codifying the principle that, "'in the absence of an express retroactivity provision, a statute will not be applied retroactively unless it is very clear from extrinsic sources'" that the Legislature intended a retroactive application. (*People v. Buycks* (2018) 5 Cal.5th 857, 880 (*Buycks*).) As a result, a statute silent with respect to retroactive application is construed to be prospective. (*Ibid.*)

Changes in trial procedures generally apply prospectively if they do not alter the substantive requirements for proving a crime or the truth of an enhancement allegation or reduce the available punishment in the event of a conviction. (See, e.g., *People v. Cervantes* (2020) 55 Cal.App.5th 927, 939–940 (*Cervantes*) [new requirements for interrogations not retroactive]; *People v. Sandee* (2017) 15 Cal.App.5th 294, 305, fn. 7 [limitation on governmental search of cell phones not retroactive].)

Under *Estrada,* however, a limited rule of retroactivity applies to newly enacted criminal statutes that are intended to

ameliorate criminal punishment. (*Buycks, supra*, 5 Cal.5th at p. 881.) "The *Estrada* rule rests on the presumption that, in the absence of a savings clause providing only prospective relief or other clear intention concerning any retroactive effect, 'a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.'" (*Cervantes, supra*, 55 Cal.App.5th at pp. 937–938.)

Thus, in *People v. Burgos, supra,* 77 Cal.App.5th 550, the leading case finding section 1109 to be retroactive, the appellate court concluded the possibility of lesser punishment mandated retroactivity under *Estrada.* (*Id.* at pp. 564–568) *Burgos* principally reasoned that "the *Estrada* rule may apply to a change in the law even where the defendants in question are not expressly given a lesser punishment as a result of retroactive application." (*Id.* at p. 565.)

*Burgos* relied on *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299 and *People v. Frahs* (2020) 9 Cal.5th 618. In those cases, as *Burgos* observed, the Supreme Court had found retroactivity for statutes that "could" result in more lenient treatment or provide a "possible ameliorating benefit." (*Burgos, supra,* 77 Cal.App.5th at p. 565.) *People v. Superior Court, supra,* 4 Cal.5th at p. 303, held that Proposition 57, a purely procedural change that prohibited prosecution of juveniles directly in adult court, applied retroactively, even though it did not reduce the punishment for a crime. *People v. Frahs, supra,* 9 Cal.5th at p. 624, held a diversion program providing the opportunity to avoid penal consequences entirely if the defendant successfully completed the program applied retroactively.

In reaching its conclusion, *Burgos* highlighted the ameliorative benefits of section 1109. (*Burgos, supra,* 77 Cal.App.5th at p. 564.) First, it provides an increased likelihood of acquittal at trial due to the removal of prejudicial gang evidence from the main guilt phase. (*Id.* at pp. 565–567.) Thus, some defendants could be acquitted of the underlying offenses in a bifurcated trial. (*Id.* at p. 567.) Second, "'[t]he mere specter of gang enhancements pressures defendants into unfavorable plea deals rather than risk a trial filled with prejudicial evidence and a substantially longer sentence." (*Id.* at p. 567, quoting Assem. Bill 333, § 2, subd. (e).)

After concluding section 1109 applied retrospectively, *Burgos* considered, without deciding, the standard of prejudice to apply. (*Burgos, supra,* 77 Cal.App.5th. at p. 568.) First, *Burgos* addressed whether the error could constitute structural error, which could mandate automatic reversal because it would affect the framework within which the trial proceeded. (*Id.* at p. 568; see *People v. Anzalone* (2013) 56 Cal.4th 545, 554 [structural error requires per se reversal because it cannot be fairly determined how a trial would have been resolved if the error had not occurred].) Without explicitly adopting structural error analysis, *Burgos* continued, "[e]ven if harmless error analysis is amenable, it is not clear whether we should apply the federal or state law standard." (*Id.* at p. 568.) Finally, *Burgos* held, "[e]ven assuming we must assess prejudice, however, we conclude appellants suffered prejudice under either the federal or state law standard." (*Ibid.*) Thus, *Burgos* offers little guidance on evaluating prejudice.

The dissent disagreed, finding section 1109 prospective only. Section 1109 "makes no change to any crime or defenses

54

and makes no change to any punishment provision, and it does not create the possibility of lesser punishment or any other 'ameliorative' benefit . . . ." (*Burgos, supra,* 77 Cal.App.5th. at p. 572 (dis. opn. of Elia, J.)).) The dissent concluded the *Estrada* rule was designed to prevent an inference the Legislature "was bent on vengeance." (*Id.* at p. 574 (dis. opn. of Elia, J.).) In summary, as a result, "there is a manifest distinction between the Legislature's creation of new criminal procedures designed to enhance fairness and its enactment of provisions that reduce the possibility of punishment." (*Id.* at pp. 573–574 (dis. opn. of Elia, J.).)

We need not decide the issue in this case. As one court has held, the *Watson* standard applies to the failure to bifurcate under section 1109. (*People v. E.H.* (2022) 75 Cal.App.5th 467, 480.) Thus, even if section 1109 applied retroactively to his case, Rivera cannot show it is "reasonably probable" he would have obtained a more favorable result if his trial had been bifurcated. (*People v. E.H., supra,* 75 Cal.App.5th at p. 480 [applying *Watson* standard to evaluation of prejudice resulting from decision not to apply section 1109 retroactively].) Where, as here, the evidence of guilt on the relevant charges is "overwhelming," it is unlikely Rivera was harmed by the format of the trial. (*Ibid.*; *People v. Pinholster* (1992) 1 Cal.4th 865, 931, overruled on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459 [concluding the failure to bifurcate was harmless under the *Watson* standard because "[t]here was overwhelming evidence of defendant's guilt on the other charges"].)

The People presented overwhelming evidence that Rivera committed the charged murders independent of any gang evidence. Rivera confessed to his cellmate at the jail that he

committed both shootings. He told Lizette he shot Morales, and Lizette witnessed Rivera shoot Nunez. Rivera used the same weapon for both offenses, spat on Morales's memorial, and had a motive to kill Nunez. Under these circumstances, we conclude that bifurcation would not have helped Rivera. (*People v. Ramos, supra,* 77 Cal.App.5th at pp. 1131–1132 [following *E.H.,* found no prejudice under *Watson* from the failure to bifurcate].)

## C. Remand for Retrial of Gang Enhancement.

### 1. Evidence Insufficient to Support Enhancement Under Amended Statute.

As discussed below, the evidence at trial that the crimes were committed for the benefit of a gang was limited to evidence that committing crimes furthers the gang's reputation for criminal conduct. This is insufficient under the new statute to support a true finding on the gang enhancement.

### (a) Predicate Offenses.

As for what constitutes a "pattern of criminal gang activity," previously the prosecution needed to prove "only that those associated with the gang had committed at least two offenses from a list of predicate crimes on separate occasions within three years of one another." (Former § 186.22, subd. (e).) Assembly Bill 333 made several changes to this definition. First, the predicate offenses now must have been committed by two or more "members" of the gang (as opposed to any persons). (§ 186.22, subd. (e)(1).) Second, the predicate offenses must be proven to have "commonly benefited a criminal street gang." (*Ibid.*) Third, the last predicate offense must have occurred within three years of the date of the currently charged offense.

56

(*Ibid*.) Fourth, the list of qualifying predicate offenses has been reduced. (*Ibid*.; see also former § 186.22) And fifth, the currently charged offense no longer counts as a predicate offense. (§ 186.22, subd. (e)(2).)

In this case, the prosecution relied upon three predicate acts to satisfy the requirements of prior section 186.22, subdivision (b)(1). These offenses do not satisfy the amended statute.

First, Ernie Lopez pleaded nolo contender to two assaults with a deadly weapon and vandalism committed on November 17, 2012, offenses that occurred more than three years before the current offenses. Vandalism is no longer a predicate offense under amended section 186.22, subdivision (e). The prosecution did not introduce evidence that the predicate offenses were gang related because the evidence was excluded.

Second, Romero (Face) pleaded nolo contender to one count of carrying a concealed firearm; the charging document contained no gang allegation. There was no evidence at trial that in doing so, Face acted for the benefit of the Lynwood Mob.

Third, Marcus Blancarte pleaded guilty to assault; the charging document contained no gang allegation. At trial, Detective Chalmers testified that after reviewing the police report, he concluded Blancarte belonged to the Lynwood Mob. However, there was no evidence that Blancarte acted to benefit the Lynwood Mob.

### (b) Insufficient Evidence of Benefit to Gang Under Amended Statute.

As noted above, amended section 186.22 requires a showing that the defendant's conduct conferred some benefit on the gang that is more than reputational. (§ 186.22 subd. (e)(1).) The benefit

can be shown by "financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or the intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).)

Those elements were not met here. Detective Chalmers opined with respect to the first victim, Morales, who was killed in Segundos territory, that because the shooting occurred in rival gang territory, the shooter would gain respect among gang members. There was no evidence, however, that the shooting was to target a perceived gang rival, or to retaliate for some prior slight.

With respect to the second victim, Nunez, the evidence was again primarily reputational. Detective Chalmers testified that someone in a gang who has been called a "bitch" by another gang member will have lost all credibility, and the only way for such an individual to regain respect would be to commit a violent act. The reputation of the Lynwood Mob would have been weakened by Nunez calling one of its members a "bitch," and by the fact that Rivera drew a firearm but did not use it. Expert testimony established that Nunez had disrespected the Lynwood Mob by calling Rivera a "bitch" and Rivera would be motivated to get his reputation back by committing a violent act. By doing so, other gang members would learn it was not permissible to disrespect the gang.

### 2. *Double Jeopardy Does Not Preclude Retrial.*

Rivera argues that retrial of the gang enhancement is precluded by the double jeopardy clauses. We disagree.

The double jeopardy clauses of the Fifth Amendment to the United States Constitution and article I, section 15, of the

California Constitution provide that a person may not be twice placed "in jeopardy" for the "same offense." (*People v. Monge* (1997) 16 Cal.4th 826, 831–832.) The double jeopardy bar protects against a second prosecution for the same offense following an acquittal or conviction, and applies where a conviction is reversed or set aside because of insufficient evidence. (*Id.* at p. 832.)

When a statutory amendment adds an additional element to an offense, however, the prosecution must be afforded the opportunity to establish the additional element upon remand. (*People v. Figueroa* (1993) 20 Cal.App.4th 65, 71.) The proper remedy for this type of failure of proof—where newly required elements were "never tried" to the jury—is to remand and give the People an opportunity to retry the affected charges. (*Id.* at p. 72, fn. 2) Such a retrial is not barred by the double jeopardy clause because the issue was not relevant to the charges at the time of trial and accordingly, the question was never tried. (*Ibid.*) Accordingly, we reverse the gang enhancements and remand the matter to the trial court for further proceedings. (*Id.* at p. 72; *People v. Eagle* (2010) 246 Cal.App.4th 275, 280.)

To the extent Rivera argues remand is inappropriate because there is insufficient evidence in the trial record to prove the enhancement under the new law, he is mistaken. Where, as here, evidence is not introduced at trial because the law at that time would have rendered it irrelevant, remand to prove that element is proper. (See *People v. Balderas* (1985) 41 Cal.3d 144, 197–199 [retrial of special circumstances issue in death penalty trial after court decision that intent to kill was required for felony-murder special circumstance].)

### 3. No Due Process Violation Based on Instructional Error.

Rivera argues the jury was misdirected on the elements of the gang enhancements thereby violating due process, and such error was prejudicial because it cannot be determined whether the jury based its verdict on a legally adequate theory. Further, he asserts that because the gang evidence was entirely reputational, the error was not harmless.

"By requiring proof for a gang enhancement that the benefit to the gang was more than reputational, Assembly Bill No. 333 essentially adds a new element to the enhancement." (*People v. Sek* (2022) 74 Cal.App.5th 657, 668.) When jury instructions are deficient for omitting an element of an offense, they implicate the defendant's federal constitutional rights, and we review for harmless error under the strict standard of *Chapman*, *supra*, 386 U.S. 18. Under the *Chapman* standard, reversal is required unless it appears beyond a reasonable doubt that the error did not contribute to the jury's verdict. (*Id.* at pp. 24–25)

In order to establish harmless error under the *Chapman* standard, it is insufficient to show that substantial evidence existed to support a conviction under the correct instructions. (*People v. Sek, supra,* 74 Cal.App.5th at p. 668.) The question is the effect of the incorrect instruction upon the guilty verdict in the case at hand—"whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." (*People v. Sek, supra,* 74 Cal.App.5th at p. 668.) The standard is met where the missing element from an instruction was uncontested or proved as a matter of law. (*Id.* at p. 669)

Here, as discussed above, the gang evidence was reputational and did not address any other benefit to the gang. Thus, the instructional error on this question was not harmless under the *Chapman* standard because there was no proper evidence upon which the jury could have based their true finding.

The remedy is retrial on the gang enhancement, something we have already ordered. Because we do not reverse based on the insufficiency of the evidence required to prove a violation of the statute as it read at the time of trial, the double jeopardy clause will not bar a retrial. (*People v. Figueroa, supra,* 20 Cal.App.4th at p. 72.)

### D.     No Error in Failing to Impose Parole Eligibility.

Rivera contends the trial court erred by failing to impose a 15-year parole eligibility date under section 186.22, subdivision (b)(5). We disagree, as this provision does not apply to life terms with no possibility of parole.

Section 186.22, subdivision (b) establishes alternative methods for punishing felons whose crimes were committed for the benefit of a criminal street gang. Where the defendant commits a violent felony "punishable by imprisonment in the state prison for life," section 186.22, subdivision (b)(5) applies and imposes a minimum term of 15 years before the defendant may be eligible for parole. This provision was not modified by AB 333 and thus Rivera's argument is simply one of sentencing error; we need not consider the issue of retrospective application.

*People v. Lopez* (2005) 34 Cal.4th 1002 (*Lopez*), held that a defendant who commits a gang-related violent felony punishable by life imprisonment is not subject to the 10-year gang enhancement under section 186.22, subdivision (b)(1)(C) but, rather, is subject to a minimum parole eligibility term of 15 years

under section 186.22, subdivision (b)(5). (*Id.* at p. 1010–1011.) *Lopez*, however, did not involve a defendant sentenced to life without parole. The defendant there was sentenced to a term of 25 years to life for first-degree murder. (*Id.* at p. 1005). Here, on the other hand, defendant was sentenced to life without the possibility of parole for first-degree murder. Because a term of life without parole contains no anticipated parole date, it would be illogical to include a minimum parole date on such a term.

Indeed, *Lopez* observed the minimum parole eligibility provision was never intended to apply to persons sentenced to life without parole. (*Lopez, supra,* 34 Cal.4th at pp. 1010–1011.) *Lopez* examined the history of the California Street Terrorism Enforcement and Prevention Act (§ 186.20 et seq.; STEP Act) and noted a 1988 enrolled bill report stated: "'"This proposed provision relating to life terms [former section 186.22, subdivision (b)(3), now section 186.22[, subdivision] (b)(5) ] would apply to all lifers (except life without possibility of parole)."'" (*Lopez, supra,* 34 Cal.4th at p. 1010.) The *Lopez* court concluded "at the time the STEP Act was enacted, the predecessor to section 186.22(b)(5) was understood to apply to *all* lifers, except those sentenced to life without the possibility of parole." (*Ibid.*)

## DISPOSITION

The gang enhancements are reversed. In all other respects, the judgment is affirmed. On remand, the prosecution shall have the option to retry the defendant on the gang allegations, and the trial court shall resentence Rivera.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


CURREY, J.


We concur:


WILLHITE, Acting P.J.


COLLINS, J.

Court of Appeal, Second Appellate District, Division Four - No. B300948

**S276624**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

_____

THE PEOPLE, Plaintiff and Respondent,

v.

MIGUEL RIVERA, Defendant and Appellant.

_____

The petition for review is denied.

(See Concurring Statement by Justice Groban.)

_____Cantil-Sakauye_____
*Chief Justice*

PEOPLE v. RIVERA

S276624


Concurring Statement by Justice Groban


While being interrogated by police, Miguel Rivera invoked his right to counsel. Nevertheless, the interrogating officers continued questioning him for another 19 minutes. During this time, Rivera invoked his right to remain silent several more times. One of the officers who interrogated Rivera testified at a subsequent suppression hearing that he knew any statements obtained after Rivera invoked his right to counsel would be suppressed pursuant to *Miranda*. (*Miranda v. Arizona* (1966) 384 U.S. 436.) The officer testified that he nonetheless continued questioning Rivera in an attempt to obtain information that could be used as part of a planned covert jail cell operation. (See *Illinois v. Perkins* (1990) 496 U.S. 292.) After Rivera invoked his right to counsel, the officers told him that they had videos for three murders. The officers also told him earlier that all three murders were committed with a nine-millimeter weapon. The next day, the officers placed an informant in a cell with Rivera. Rivera and the informant discussed, among other things, the very topics discussed the day before in the interrogation conducted in violation of *Miranda*. Rivera told the informant that they had a video for one murder, but did not think they could identify him because his face was covered. Rivera also said that he did not know how law enforcement knew he committed the second murder, but believed it was because the same weapon was used for both crimes. This recorded discussion was introduced by the

1

prosecution at Rivera's trial and Rivera was ultimately convicted of, among other crimes, two counts of first degree murder.

The protection afforded by *Miranda* is clear: "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." (*Miranda*, *supra*, 384 U.S. at p. 474.) Here, the interrogation did not cease. To the contrary, law enforcement deliberately interrogated Rivera after he invoked his right to counsel. The officer knew that continued interrogation violated *Miranda* and that the statements would not be admissible at trial, but he kept questioning Rivera anyway. I therefore have serious doubts as to whether the procedure employed here is lawful. However, because the Court of Appeal found the error harmless, I do not vote to grant review. Perhaps a more complete record, developed on habeas corpus, will present a different picture.

**GROBAN, J.**

**We Concur:**

**LIU, J.**
**JENKINS, J.**